CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

NOV 1 4 2016

JULIA C. DUDLEY, CLERK
BY: _____
     DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

BRIAN WISHNEFF & ASSOCIATES,   )
)
    Plaintiff,           )
)     Civil Action No. 7:15-cv-00411
v.                      )
)
10 SOUTH STREET ASSOCIATES, LLC,  )  By: Hon. Michael F. Urbanski
)      United States District Judge
    Defendant.      )
)

## MEMORANDUM OPINION

Currently pending before the court in this breach of contract case are defendant 10 South Street Associates, LLC's second motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, motion for summary judgment (ECF No. 44), and its third motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) (ECF No. 63).[1] At a hearing held on the former motion on May 2, 2016, the court questioned whether it had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332—specifically, whether the amount in controversy exceeds the $75,000 jurisdictional threshold. The court took 10 South Street's Rule 12(b)(6) motion under advisement, ordered a period of jurisdictional discovery, and allowed time for further briefing. 10 South Street thereafter filed its Rule 12(b)(1) motion. The issues have been fully briefed and are now ripe for adjudication.

---

[1] 10 South Street first moved to dismiss for lack of personal jurisdiction. The court denied this motion by Memorandum Opinion and Order entered February 16, 2016.

As set forth in detail below, the court finds there is a genuine issue of material fact as to the amount of any fee due plaintiff Brian Wishneff & Associates ("Wishneff") under the contract and the payment schedule for such a fee. The court therefore cannot find to a legal certainty that Wishneff is unable to recover an amount exceeding the jurisdictional threshold. As such, 10 South Street's third motion to dismiss pursuant to Rule 12(b)(1) will be **DENIED**.

Additionally, because there is a genuine issue of material fact as to whether 10 South Street owes any fee to Wishneff for its performance under the contract prior to termination, 10 South Street's Rule 12(b)(6) motion, which the court will treat as a motion for summary judgment, will be **DENIED**. This matter will be set down for further proceedings.

## I.

10 South Street is a real estate developer designated by the City of New York for the potential renovation of the former Battery Maritime Building at the southern tip of Manhattan ("the Project"). In connection with the Project's development, 10 South Street sought to utilize the federal and state historic tax credit program to assist in funding a portion of the renovation cost. To that end, 10 South Street enlisted the consulting services of plaintiff Brian Wishneff & Associates to locate and secure historic tax credit ("HTC") investors and other financial incentives. 10 South Street and Wishneff entered into the Battery Maritime Building Historic Tax Credit Agreement on October 26, 2009 ("the Agreement"). Wishneff's obligations under the Agreement included managing the tax credit process through to payment, evaluating ways to maximize the Project's qualified rehabilitation expenses, and securing at least three term sheets or offers from at least three

2

historic tax credit investors. The Agreement provides in a section titled "Fees and Schedule"

that Wishneff shall earn a fee for its work

> in an amount equal to 7% of the gross equity payment by the historic tax credit Investor; however such a fee payment(s) shall not exceed $1,000,000. If sufficient funds are available from a credit investor and/or a bridge loan lender, the Consultant [Wishneff] shall be paid 20% of its fee at closing, 20% half-way through to closing, 45% at certificate of occupancy or occupancy and 5% upon any final equity payment by the Investor. In addition, the Consultant shall be reimbursed on a monthly basis for direct expenses such as travel, long distance calls and sending overnight packages, whether a tax credit closing occurs or not. However, the Consultant's expenses to be reimbursed shall not exceed $10,000 and such expenses shall be subtracted from the fee.

ECF No. 45-5, at 5. The Agreement also contains the following termination provision:

> If the Consultant [Wishneff] has not produced a term-sheet from a historic tax credit investor within 90 days, then after 90 days the Developer [10 South Street] may terminate this Agreement at any time for convenience. If at any point in the future the Developer withdraws from the project the Developer can terminate for convenience. In addition, at any time after the eighteen (18) month anniversary of execution of this Agreement, the Developer may terminate this Agreement for convenience. Upon such a termination, Consultant shall deliver a list of all potential investors ("Potential Investors") that it has contacted related to the HTCs being generated by the Project. If any [sic] anytime in the future, Developer proceeds with the Project and one of the Protected Investors becomes an investor in any [historic tax credits] generated by the Project, Consultant shall earn its full fee pursuant to the Fee and Schedule section above. If, however, Developer moves forward with a HTC investor that is not one of the Protected Investors, Consultant shall earn one-half (1/2) of the fee that it would have otherwise earned under the Fee and Schedule section above.

Id. at 7.

In its second amended complaint, Wishneff alleges that it secured PNC Bank as an HTC investor "with projected $37,201,038 in capital contributions" on January 24, 2012. Second Am. Compl., ECF No. 68, at ¶ 15. Wishneff claims that at "the initial equity closing for the Project on or about June 25, 2012," PNC made an "initial equity contribution of $200,000 into the Project." Id. at ¶ 16. On December 10, 2012, Wishneff invoiced 10 South Street for twenty percent of the fee it claims was due at the closing of the PNC investor loan. Id. at ¶ 19. 10 South Street refused to make a payment. Id. On March 26, 2015, Wishneff invoiced 10 South Street for twenty percent of its fee that was due, and again 10 South Street refused to make payment. Id. at ¶ 20. On July 27, 2015, 10 South Street served Wishneff with a "Notice to Terminate Agreement," in which defendant stated it was withdrawing from the Project "for convenience." Id. at ¶ 21. Wishneff filed the instant breach of contract action on July 29, 2015, alleging that 10 South Street breached the parties' Agreement by failing to pay Wishneff its fee of seven percent of PNC's projected contribution of $37,201,038, capped at $1,000,000. Id. at ¶ 26. Wishneff claims this fee was "earned when the HTC investor, PNC Bank, made its investment." Id. at ¶ 27. Wishneff seeks $1,000,000 plus interest and costs in its second amended complaint. Id. at ¶ 28.[2]

## II.

The burden of proving subject matter jurisdiction lies with the plaintiff. See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936). On its face, Wishneff's second amended complaint appears to satisfy the amount-in-controversy requirement of § 1332, and

---

[2] While Wishneff's pleadings seek $1,000,000, it has conceded that its claim is limited to $200,000, representing the 20% fee it asserts was due when PNC contributed $200,000 on or about July 1, 2012. See Rule 30(b)(6) Dep. of Brian Wishneff & Assoc., ECF No. 63-8, at 55, 68-71, 80, 84.

"[c]ourts generally determine the amount in controversy by reference to the plaintiff's complaint." JTH Tax, Inc. v. Frashier, 624 F.3d 635, 638 (4th Cir. 2010) (citing Wiggins v. N. Am. Equitable Life Assurance Co., 644 F.2d 1014, 1016 (4th Cir. 1981) ("Ordinarily the jurisdictional amount is determined by the amount of the plaintiff's original claim, provided that the claim is made in good faith."))[3]

While the sum claimed by the plaintiff typically controls the amount in controversy requirement, a court may dismiss an action for lack of subject matter jurisdiction if "'it is apparent, *to a legal certainty*, that the plaintiff cannot recover the amount claimed.'" Id. (quoting St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938)) (emphasis added by the Fourth Circuit).

> Defendants, seeking dismissal of diversity actions for lack of a sufficient amount in controversy, must therefore shoulder a heavy burden. They must show "the legal impossibility of recovery" to be "so certain as virtually to negative the plaintiff's good faith in asserting the claim." Wiggins v. N. Am. Equitable Life Assurance Co., 644 F.2d 1014, 1017 (4th Cir. 1981) (internal quotation omitted). A mere dispute over the mathematical accuracy of a plaintiff's damages calculation does not constitute such a showing. See McDonald v. Patton, 240 F.2d 424, 425 (4th Cir. 1957) (noting that plaintiffs may secure federal jurisdiction even when "it is apparent on the face of the claim" that the claim to the requisite amount is subject to a "valid defense").

Id.

---

[3] As a general rule, federal courts apply state substantive law and federal procedural law in diversity cases. Hottle v. Beech Aircraft Corp., 47 F.3d 106, 109 (4th Cir. 1995). The legal standard governing a motion to dismiss pursuant to Rule 12(b)(1) is a procedural matter and is governed by federal law. See Banner Life Ins. Co. v. Bonney, No. 2:11CV198, 2011 WL 5027498, at *3 (E.D. Va. Oct. 21, 2011).

5

## A.

In its third motion to dismiss,[4] 10 South Street argues Wishneff's claim is a legal impossibility under the parties' Agreement. The Agreement provides that Wishneff is entitled to seven percent of the "gross equity payment by the historic tax creditor Investor," which fee is capped at $1,000,000. It further provides that "[i]f sufficient funds are available," Wishneff shall be paid "20% of its fee at closing . . . ." There is no dispute that PNC bank only delivered $200,000 in connection with the Project. 10 South Street argues that, at best, Wishneff is entitled to seven percent of that $200,000 payment ($14,000) and of that, only twenty percent ($2,800) was due at closing per the contract terms.

Wishneff insists that it is entitled to seven percent of PNC's projected contribution of $37,201,038, capped at $1,000,000, twenty percent of which ($200,000) was due at closing on June 25, 2012. Wishneff asserts that "[t]he Fees and Schedule section of the Agreement [between Wishneff and 10 South Street] must be read in total and in the context of the original agreement that Wishneff had on the BMB project." Pl.'s Opp. Br. to Third Mot. to Dismiss, ECF No. 66, at 5. This contract between Wishneff and the original developer of the Project, BMB Associates, LLC, provided for a fee of ten percent of the amount paid by an HTC investor, with no cap on the amount Wishneff could earn. See id. at Ex. 1. Stephen Benjamin, on behalf of BMB Associates, negotiated this original contract with Wishneff. Rule 30(b)(6) Dep. of 10 South Street Assoc., ECF No. 66-2, at 9. BMB Associates ultimately did not proceed with the Project, and the entity dissolved during the ensuing

---

[4] In determining whether jurisdiction exists pursuant to challenge raised under Rule 12(b)(1), the court may consider evidence outside the pleadings without converting the motion to one for summary judgment. Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). The standard applicable to motions for summary judgment applies, however, and the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists as to the court's jurisdiction. Id.

financial crisis. Id. 10 South Street later was formed and began developing the Project "fresh." Id. In connection with this new Project development, a new Historic Tax Credit Agreement was executed between Wishneff and 10 South Street, which Stephen Benjamin again negotiated, this time on behalf of 10 South Street. Id. at 10-11. Benjamin testified that in order to do business a second time on the Project, Wishneff's fee had to be lower because the ten percent rate was "inappropriate for what we were doing." Id. at 12. Benjamin also insisted on a cap. Id. Wishneff claims that it specifically negotiated a front-loaded fee arrangement with 10 South Street in exchange for reducing its flat rate fee from ten percent to seven percent and capping it at $1,000,000. According to Wishneff, this was a deviation from its standard practice and the reason the payment schedule, providing for Wishneff's fee to be paid in stages over the course of the Project development, with twenty percent due at closing, was incorporated into the Agreement. Pl.'s Opp. Br. to Third Mot. to Dismiss, ECF No. 66, at 2, 3; Rule 30(b)(6) Dep. of Brian Wishneff & Assoc., ECF No. 66-3, at 90. Wishneff argues there are genuine issues of material fact surrounding the fee it earned pursuant to the Agreement and the schedule of payment of that fee. And because the amount in controversy is in dispute, Wishneff asserts it would be improper for the court to dismiss this case for lack of jurisdiction pursuant to Rule 12(b)(1).

Wishneff's argument is grounded in extrinsic evidence, yet it fails to identify any ambiguity in the Agreement that would allow the court to consider evidence outside the four corners of the contract. See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170 (2002) ("Extrinsic evidence of the parties' intent may be considered only if

the agreement is ambiguous. . . .").[5] Nonetheless, ambiguity is ultimately an issue of law for the court to decide. Id.

"An agreement is ambiguous when 'the agreement on its face is reasonably susceptible of more than one interpretation.'" Nappy v. Nappy, 40 A.D.3d 825, 826, 836 N.Y.S.2d 256, 257 (2007) (quoting Chimart Assoc. v. Paul, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986))).

> A contract is unambiguous if the language it uses has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion" (Breed v. Insurance Co. of N. Am., 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 [1978], rearg. denied 46 N.Y.2d 940, 415 N.Y.S.2d 1027, 388 N.E.2d 372 [1979]). Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity (see e.g. Teichman v. Community Hosp. of W. Suffolk, 87 N.Y.2d 514, 520, 640 N.Y.S.2d 472, 663 N.E.2d 628 [1996]; First Natl. Stores v. Yellowstone Shopping Ctr., 21 N.Y.2d 630, 638, 290 N.Y.S.2d 721, 237 N.E.2d 868, rearg. denied 22 N.Y.2d 827, 292 N.Y.S.2d 1031, 239 N.E.2d 659 [1968]).

Greenfield, 98 N.Y.2d at 569–70, 780 N.E.2d at 170–71. In deciding whether an agreement is ambiguous, the court "'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.'" Nappy, 40 A.D.3d at 826, 836 N.Y.S.2d at 257 (quoting Kass v. Kass, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998)). Having done so in this case, the court concludes the Agreement is ambiguous— specifically the language in the Fees and Schedule provision.[6] The parties

---

[5] The Agreement provides that the contract shall be construed and enforced in accordance with the laws of the State of New York. ECF No. 45-5, at 7.

[6] Interestingly, while 10 South Street now argues in connection with its Rule 12(b)(1) motion that the Agreement is unambiguous and parol evidence is inadmissible, it took the opposite position in its reply brief to its Rule 12(b)(6)

8

dispute the meaning of the term "gross equity payment." Indeed, it is reasonably susceptible of more than one interpretation. 10 South Street argues the word "payment" means payment—funds actually delivered—and the only payment made by PNC in connection with the Project was $200,000. On the other hand, the word "gross" suggests the parties intended to calculate Wishneff's fee based on the aggregate amount of capital contributions the HTC investor agreed to contribute to the Project, as Wishneff argues. "Gross equity payment" is not defined in the parties' Agreement and its meaning is unclear.

There is also ambiguity in the structured payment schedule. The contract reads "the Consultant shall be paid 20% of its fee at closing, 20% *half-way through to closing*, 45% at certificate of occupancy or occupancy and 5% upon any final equity payment by the Investor." ECF No. 45-5, at 5 (emphasis added). This makes little sense. On brief, Wishneff substitutes the word "completion" for "closing," so that the second payment of 20% is due "halfway through to completion." That might well be what the parties intended, but that is not how the contract reads.

Given these ambiguities, the court cannot find the contract language has a definite and precise meaning. Extrinsic evidence is therefore admissible to determine the parties' intent.

## B.

Stepping outside the four corners of the contract, the court agrees with Wishneff that there are at least genuine issues of material fact as to the fee potentially due Wishneff under

---

motion as well as during the May 2, 2016 oral argument, at which it asserted the term "gross equity payment" is not defined in the contract, the contract is ambiguous, and the court can consider parol evidence. Compare Def.'s Br. in Support of Third Mot. to Dismiss, ECF No. 63-1, at 8-9 with Reply Br. to Rule 12(b)(6) Mot., ECF No. 51, at 4-5 and May 2, 2016 Tr., ECF No. 63-2, at 11.

the Agreement, as well as the payment schedule for that fee. The original contract between Wishneff and BMB Associates provides for a ten percent fee and states: "The Consultant shall be paid on the same schedule as the Developer receives payments and/or benefits from the Historic Tax Credit Investor and all other Incentives received." Pl.'s Br. in Opp. to Third Mot. to Dismiss, ECF No. 66-1. In the course of negotiating the second contract between Wishneff and 10 South Street, Stephen Benjamin made handwritten changes to this provision of the BMB Associates contract. See 10 South Street Rule 30(b)(6) Dep., ECF No. 63-7, at 15.

10

will assist the Developer throughout with good bookkeeping and record keeping practices related to determining the amount of QRE. The Consultant will also assist in the preparation of information so that the accounting firm can carryout their job in the best, most efficient manor and will be on-site during the audit to answer any questions the accountants might have related to their work. The Consultant shall also review initial drafts of these audits to discuss any discrepancies over items overlooked during the audit. The Consultants experience has been that every draft "Cost Certification Audit reviewed has resulted in the QRE in draft audit was adjusted upward in the final version of the Cost Certification Audit.

13. **Payment by Tax Credit Investors and any other Incentives.** The Consultant will do the work necessary to secure the Investment by the HTC Investors and other Incentives secured.

14. **HTC Opinions.** The Consultant shall provide a written opinion in a form acceptable to Developer as to the eligibility of the Project receiving HTC and an amount of equity to be received based on an estimated QRE.

## FEES AND SCHEDULE

*[handwritten: provided the total fee and expense reimbursement shall not exceed $1,000,000]*

The Consultant shall earn a fee in an amount equal to ~~10%~~ *[handwritten: 7%]* of the equity payment by the historic tax credit investor and 10% of other equity and/or forms of Investment, whether in the form of "equity-like" Investments or other Investments that directly reduce the amount of equity that Developer has to contribute to the project. The Consultant shall be paid on the same schedule as the Developer receives payments and/or benefits from the Historic Tax Credit Investor ~~and all other Incentives received~~. In addition, the Consultant shall be reimbursed on a quarterly basis for direct expenses such as travel, long distance calls and sending overnight packages, whether a tax credit closing occurs or not. However, the Consultant's expenses to be reimbursed shall not exceed ~~$7,500~~ and such expenses shall be subtracted from the fee.

*[handwritten: ok to be more]*

The Consultant will begin work upon the signing of this agreement.

*[handwritten: Pre...]*

## MISCELLANEOUS

1. Consultant shall act in a professional manner and shall accord due care to the Project of at least the same level or better than would be accorded by such consultants to projects similar in nature and

*[handwritten: C if developer receives 10% of the total credit payment amount the consultant receives 10% of fee]*

Benjamin crossed out the 10% figure and wrote in the margin: "7% provided the total fee and expense reimbursement shall not exceed $1,000,000." Id. As regards the payment

11

schedule, he crossed out "and all other Incentives received" and wrote in the margin: "(if developer receives 10% of the total credit payment amount the consultant receives 10% of fee)." Id. Benjamin testified that the lower fee, the cap, and the payment schedule reflected in these handwritten changes were all his suggestions. 10 South Street Rule 30(b)(6) Dep., ECF No. 66-2, at 12, 16.

Two of these suggested changes—the reduction to a 7% fee and the $1,000,000 cap—were incorporated into the new Agreement between Wishneff and 10 South Street. Benjamin's handwritten change to the sentence setting out the payment schedule does not appear in the final Agreement, however. Indeed, the contract contains an entirely new payment schedule, reinforcing Wishneff's Rule 30(b)(6) deposition testimony and argument on brief that it wanted its fee payments front loaded in exchange for agreeing to reduce and cap its fee. Wishneff Rule 30(b)(6) Dep., ECF No. 66-3 at 51.

The differences between the BMB Associates contract and 10 South Street contract—more specifically, the differences in payment schedules—are noteworthy in this jurisdictional analysis. The original contract between Wishneff and BMB Associates plainly contemplates that the HTC investor would make its total investment in installments over time, and Wishneff would be paid its fee in corresponding installments, proportional to the percentage of the "total credit payment amount" paid by the HTC investor, as Benjamin explained in his handwritten parenthetical. A plausible (if not the most logical) reading of the original contract with BMB Associates militates against interpreting the word "payment" to mean funds actually delivered, as 10 South Street urges the court to do. Indeed, in order to make sense of this original contract (with or without Benjamin's handwritten changes),

12

"10% of the equity payment by the historic tax credit investor" must mean ten percent of the aggregate amount of the HTC investor's capital contributions.

It follows, then, that "7% of the gross equity payment" means the same thing in the second contract with 10 South Street.[7] Otherwise, there would be no need for the fee payment schedule. Unlike in the BMB Associates contract, payment of Wishneff's fee in the 10 South Street Agreement is triggered primarily by hitting certain milestones in the Project development, not by the funds actually delivered by the HTC investor.[8] According to corporate designee Erik Wishneff, this is atypical:

> Okay. I don't recall any other proposal that we have ever done where we have had this language in here where we've staggered the payment. Typically all of our proposals are based upon when the actual equity is coming into the deal. But we made this exception here with 10 South Street because we—in exchange for agreeing to reduce our fee and in exchange for the termination provision that they required, we were to receive the front, more front-loaded payments. So this was highly unusual and I don't think we have this in any other agreement we have ever signed.

Wishneff Rule 30(b)(6) Dep., ECF No. 66-3, at 90.

In short, Wishneff's interpretation of the contract is plausible, and there is a question of fact as to how much Wishneff is owed under the Agreement and when its fee was to be paid. The court cannot find on this record that it is legally impossible for Wishneff to recover an amount above the jurisdictional threshold. Nor can it find that "there is a mere pretense as to the amount in dispute." McDonald v. Patton, 240 F.2d 424, 425 (4th Cir.

---

[7] Indeed, the parties added the word "gross" to this provision in the second contract, lending further support to Wishneff's interpretation of the word "payment" in the Agreement with 10 South Street. ECF No. 45-5 ("The Consultant shall earn a fee in an amount equal to 7% of the *gross* equity payment by the historic tax credit Investor. . . ." (emphasis added)).

[8] Only one installment of Wishneff's fee payment schedule is tied to delivery of funds by the historic tax credit investor: ". . . and 5% upon any final equity payment by the Investor." ECF No. 45-5.

1957). There is no suggestion that Wishneff brings this claim in bad faith. It is therefore sufficient for jurisdictional purposes, even if it is apparent on the face of the claim that 10 South Street has a valid defense. Id.; see discussion infra. Accordingly, 10 South Street's third Motion to Dismiss pursuant to Rule 12(b)(1) will be **DENIED**.

## III.

10 South Street also argues this case should be dismissed for failure to state a claim under Rule 12(b)(6) or, in the alternative, Rule 56. 10 South Street contends the parties' Agreement contains a valid, unilateral termination provision, which it exercised on July 27, 2015, and which bars recovery in this case. The contract provides:

> 4. If the Consultant [Wishneff] has not produced a term-sheet from a historic tax creditor investor within 90 days, then after 90 days the Developer [10 South Street] may terminate this Agreement at any time for convenience. If at any point in the future the Developer withdraws from the project the Developer can terminate for convenience. In addition, at any time after the eighteenth (18) month anniversary of the execution of this Agreement, the Developer may terminate this Agreement for convenience. Upon such a termination, Consultant shall deliver a list of all potential investors ("Protected Investors") that it has contacted related to the HTCs being generated by the Project. If any [sic] anytime in the future, Developer proceeds with the Project and one of Protected Investors becomes an investor in any HTCs generated by the Project, Consultant shall earn its full fee pursuant to the Fee and Schedule section above. If, however, Developer moves forward with a HTC investor that is not one of the Protected Investors, Consultant shall earn one-half (1/2) of the fee that it would have otherwise earned under the Fee and Schedule section above.

ECF No. 45-5. In support of its argument, 10 South Street points to a series of emails between the parties that shed light on the parties' intentions in drafting this termination provision. For reasons previously explained, the court finds this contract to be ambiguous

14

and therefore will consider this extrinsic evidence in an effort to determine the parties' intent in drafting the Agreement. In so doing, the court will treat 10 South Street's motion to dismiss as a motion for summary judgment under Rule 56 as required by Rule 12(d).[9]

### A.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the

---

[9] 10 South Street gave Wishneff appropriate notice that its motion could be considered under Rule 56 by filing it as a motion to dismiss or, in the alternative, motion for summary judgment. See Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998). Wishneff argues on brief that it is inappropriate for the court to convert this motion to one for summary judgment not because Wishneff did not have proper notice, but because the contract is unambiguous and parol evidence is inadmissible. The court has already determined, however, that there is ambiguity in this Agreement, and Wishneff raises no other objection to the court's application of a summary judgment standard to this motion. While Wishneff did not attach evidence to its brief in opposition to 10 South Street's Rule 12(b)(6) motion, the court subsequently ordered a period of discovery in this case and Wishneff included evidence for the court's consideration in its brief in opposition to 10 South Street's third motion to dismiss pursuant to Rule 12(b)(1), which incorporated its 12(b)(6) motion and argument.

specific material facts in dispute to survive summary judgment.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party.  Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)).  Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."  Anderson, 477 U.S. at 255.  However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'"  Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252).  Indeed, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party."  Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249).  "In other words, to grant summary judgment the Court must determine that no reasonable jury could find for the non[-]moving party on the evidence before it."  Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

### B.

Wishneff argues 10 South Street's motion must fail because the unilateral termination provision it relies upon is illusory, invalid and unenforceable.  Specifically, Wishneff claims 10 South Street does not have the right to unilaterally terminate the contract after Wishneff has performed and then withhold the fee Wishneff was due under the terms of the parties' Agreement.  In so arguing, Wishneff insists the facts presented in this case demand a

16

different result from that in <u>Niagara Mohawk Power Corp. v. Graver Tank & Manufacturing Co.</u>, 470 F. Supp. 1308 (N.D.N.Y. 1979), a case on which 10 South Street relies.

<u>Niagara Mohawk</u> involved a contract for the fabrication and erection by defendant Graver Tank of the reactor primary containment steel plate liner for a nuclear power plant owned by plaintiff Niagara Mohawk and four other New York public utilities as co-tenants. The contract contained a unilateral termination clause allowing Niagara Mohawk to terminate at any time for any reason so long as it gives Graver two days' prior written notice to that effect. Niagara Mohawk exercised this provision of the contract giving Graver the required notice and, that same day, entered into a contract with a different contractor, Chicago Bridge & Iron Company, for completion of the project. The parties each brought actions seeking specific performance under the contract and moved for preliminary injunctions. 470 F. Supp. at 1311-12. Graver argued the relevant termination provision could only be exercised in good faith. For its part, Niagara Mohawk asserted it had an unrestricted, unilateral right to terminate the contract.

Noting it was not aware of any New York cases which had considered this question, the court conducted a thorough examination of instructive precedent, concluding New York courts would enforce a unilateral termination clause as written. The court rejected Graver's argument that a unilateral termination clause, without a good faith requirement, constitutes an illusory promise lacking in consideration, and it held that a notice provision, such as the one in the termination clause in question, prevented the promise from being regarded as illusory. <u>Id.</u> at 1316. According to the court, "[a] contract is not invalid merely because the burdens imposed upon the parties are not equal." <u>Id.</u> at 1316-17.

17

In so finding, the court distinguished cases relied upon by Graver for the proposition that an unrestricted termination provision is limited by a good faith requirement. Specifically, the court found Graver's reliance on Zimmer v. Wells Management Corp., 348 F. Supp. 540 (S.D.N.Y. 1972), which involved an employment contract, to be misplaced. According to the court in Niagara Mohawk, there was no indication from the Zimmer court's decision that the contract at issue contained an unrestricted termination clause. And, in any event, the Zimmer court was concerned that the employee's discharge would result in a forfeiture of stock benefits that had constituted part of the consideration for the employment agreement. The Niagara Mohawk court distinguished the facts in Zimmer, stating: "Termination in the present case will not result in a forfeiture since Graver has been paid for the work it has already performed." 470 F. Supp. at 1316.

Wishneff distinguishes the facts in the instant case from those in Niagara Mohawk on two grounds. First, Wishneff claims 10 South Street's unilateral termination would result in a forfeiture in this case because 10 South Street terminated the contract after Wishneff performed but before paying Wishneff the $200,000 due at closing on June 25, 2012. Wishneff also argues that unlike in Niagara Mohawk, the unilateral termination provision does not contain a notice requirement and is, therefore, illusory.

"[C]ourts avoid an interpretation that renders a contract illusory and therefore unenforceable for lack of mutual obligation (Dorman v. Cohen, 66 A.D.2d 411, 415, 413 N.Y.S.2d 377) and prefer to enforce a bargain where the parties have demonstrated an intent to be contractually bound (Wood v. Lucy, Lady Duff–Gordon, 222 N.Y. 88, 118 N.E. 214)." Curtis Properties Corp. v. Greif Companies, 212 A.D.2d 259, 265–66, 628 N.Y.S.2d 628,

632 (1995). The Agreement in this case establishes intent by the parties to be contractually bound. Wishneff is correct that the unilateral termination provision in this contract does not contain a notice requirement, but it nevertheless is a restricted termination option. 10 South Street can terminate for convenience under certain circumstances: a) if Wishneff has not produced a term-sheet from an HTC investor within 90 days; b) if it withdraws from the Project; or c) at any time after the 18 month anniversary of the execution of the Agreement. See Satenstein v. Satenstein, 42 Misc. 2d 398, 402, 248 N.Y.S.2d 281, 285 (Sup. Ct. 1963) ("Thus, any restriction whatever upon the option to terminate will prevent the option from impairing the mutuality of the agreement."), aff'd, 20 A.D.2d 700, 247 N.Y.S.2d 380 (1964).

Additionally, there is independent consideration for 10 South Street's exercise of the termination provision. If it terminates under any of the above circumstances, 10 South Street is obligated to pay Wishneff its fee pursuant to the contract terms if at any time in the future 10 South Street proceeds with the Project and one of the investors previously contacted by Wishneff in connection with the Project becomes an HTC investor. It is also obligated to pay Wishneff one-half of the fee it otherwise would have earned under the Agreement if 10 South Street moves forward with any HTC investor, even one that was **not** on the list of investors contacted by Wishneff in connection with the Project. ECF No. 45-5. Additionally, the "Fees and Schedule" section of the contract provides that Wishneff will be reimbursed its monthly direct expenses "whether a tax credit closing occurs or not." Id.

Mutuality of obligation does not mean equality of obligation; it means that each party must be bound to some extent. Dorman v. Cohen, 66 A.D.2d 411, 415, 413 N.Y.S.2d 377, 380 (1979). There is sufficient consideration for the parties' Agreement in this case. The

19

court therefore declines to find this Agreement void and unenforceable for lack of mutuality of obligation.

## C.

Having determined the unilateral termination provision is not illusory, the court turns to Wishneff's argument that 10 South Street failed to pay for Wishneff's performance under the contract prior to exercising its option to terminate. The question to be answered is whether, as a matter of law, exercise of the unilateral termination provision at any time by 10 South Street bars any and all recovery by Wishneff in this case. On this record, the court cannot answer that question in the affirmative.

10 South Street asserts that on or about June 25, 2015, it withdrew from the Project following the "unprecedented historic ruling in Historic Boardwalk Hall[, LLC v. Commissioner of Internal Revenue, 694 F.3d 425 (3d Cir. 2012), cert. denied, 133 S. Ct. 2734 (2013)]." Def.'s Br. in Support of Rule 12(b)(6) Mot., ECF No. 45-1, at 4, 8. Pursuant to this ruling, PNC no longer qualified as an HTC investor for the Project. Aff. of Stephen Benjamin, ECF No. 45-2, at ¶ 23. By agreement dated June 25, 2015, 10 South Street returned PNC's "paid-in Capital Contribution made to the Company in the amount of $200,000.00" plus $183,117.05 in legal fees and expenses. Id. at ¶ 24; ECF No. 45-6. Due to delays and construction cost increases, the Project became economically unfeasible and 10 South Street discontinued development, resulting in an estimated loss of $5,000,000. Aff. of Stephen Benjamin, ECF No. 45-2, at ¶¶ 26-27. By notice dated July 27, 2015, 10 South Street informed Wishneff that it was terminating the Agreement, citing the provision that allows it to terminate if it withdraws from the Project at any point. ECF No. 45-7.

20

10 South Street claims that by exercising its termination rights under the Agreement, it owes Wishneff nothing. It further argues that communications between the parties during the contract negotiations "clearly demonstrate that their intent was for Wishneff to not receive any compensation should the BMB project fail or should South Street not need an HTC investor for the project." Def.'s Br. in Support of Rule 12(b)(6) Mot., ECF No. 45-1, at 8. In support of its argument, 10 South Street points to a string of emails between Erik and Brian Wishneff and Stephen Benjamin as they were negotiating the contract terms beginning October 5, 2009. Benjamin writes:

> b- i dont like what you wrote about termination. we cannot be bound (forever) on any agreement. by writing "if you get a term sheet, then we can terminate…" you eliminate our ability to just terminate. if you want to leave that sentence in then you need to give us the separate right (later on) say at 6 months) to just end this with no strings attached. dermot just cant be tied up without clear rules of engagement. please modify again, or put in what i had, which protected you for a year or so.
>
> the other section was fine. its just this point.

ECF No. 45-3. Erik Wishneff responds:

> I think our issue is that we cannot be at risk that at some time in the future we could be cut out of the deal. I believe we can modify the language to allow for the termination that you contemplate below, however, if you elected to move forward with the use of historic tax credits after terminating our agreement for convenience, we would need be paid our fee. If you cancelled the project or moved forward without tax credits, we would not be due a fee, whether or not our agreement remained in place. This is the only way that we can truly protect ourselves from providing an attractive term sheet and then our client terminating our agreement and negotiating with the investor on their own. This is the reason we write our contracts this way. Please let me know if you have any questions.

Id. Benjamin wrote back:

Hi erik. We are ok with protecting people, we always have, but we need a term. We will in all likelihood get this done if you get the term sheet, but we could just not and we may want to end this, and then we will protect you, but not forever. I thought I said one year? that seems reasonable, but only for people you show the deal to and (act as procuring cause...".

Please send language back again when you can. We remain ready to try this if we can get the deal together.

Id. Brian Wishneff replies:

Steve:

You said in a previous email the City needs a term-sheet on the HTC before the end of the year. If we do not produce a term-sheet by the end of the year it sounds like there is no project and we are all finished with this project.

If we do produce a term-sheet on the HTC before the end of the year and if you get a term-sheet on the bonds and if the project gets done we expect to receive our full fee. What part of that are you objecting to?

Brian

Id. Benjamin answered:

your first paragraph is all correct. your second paragraph is also correct- but the way you changed the termination, we cannot terminate this whole thing if you get a term sheet. it is very possible in this market you get this term sheet, but we still cant get it done-- for whatever reason... we need to be able to terminate this and fold. we will protect you for a year on the investors you worked on—thats it. i fail to understand what is wrong with what we proposed. this is not an agreement for life.... if you dont get any term sheet-- then we terminate and that is obviously it. if you get it, and we termninate [sic]—we protect you for investors who you were involved with, but its still over.

Id. Erik Wishneff responded:

22

Steve,

I think we might be talking past each other a bit. If there is no closing on tax credits for whatever reason (project does not move forward, the building is torn down, you move forward without tax credits), our agreement already contemplates that we do not get paid. We do, however, get paid if we are able to provide a HTC term sheet and you as the developer proceed to develop this property as a tax credit project. Again, if you do not, then we don't get paid.

Id. Benjamin:

[I'm] still not sure what you are saying. if you get a term sheet—from investor x (call them pnc), but we dont do it—for whatever reason we cant get the money together. then two years go by—brian has retired and is on the beach somewhere and you are doing office brokerage throughout the Midwest—and we do a tax credit deal then with Citibank--why and how i do not know—then in that instance—would you be entitled to be paid??

again - i dont understand what you are saying. drew and i need the right to terminate this at anytime after the lock-out period for any reason and then to move on if we terminate then there are two scenarios: 1) you produced a term sheet from someone as you said you would, or 2) you did not. if you did not then you are entitled to nothing except the expense reimbursement, if you did get the term sheet, then we will be obligated to pay you a commissions if we go back to your group of investors (we will protect the investor group that you specifically went to on the deal for one year after that)

what are you specifically saying?

Id. In response to this last email, Brian Wishneff forwards a redlined draft of the Agreement with the following termination language, asking, "See if the attached change captures what you are saying?"

4. If the Consultant has not produced a term-sheet from a historic tax credit investor within 90 days, then after 90 days the Developer may terminate this Agreement at any time for

convenience. <u>If at any point in the future the Developer withdraws from the project the Developer can terminate for convenience.</u>

ECF No. 45-4.

Ultimately, this language was included in the final Agreement, with the following additions:

> 4. If the Consultant has not produced a term-sheet from a historic tax creditor investor within 90 days, then after 90 days the Developer may terminate this Agreement at any time for convenience. If at any point in the future the Developer withdraws from the project the Developer can terminate for convenience. In addition, at any time after the eighteenth (18) month anniversary of the execution of this Agreement, the Developer may terminate this Agreement for convenience. Upon such a termination, Consultant shall deliver a list of all potential investors ("Protected Investors") that it has contacted related to the HTCs being generated by the Project. If any [sic] anytime in the future, Developer proceeds with the Project and one of Protected Investors becomes an investor in any HTCs generated by the Project, Consultant shall earn its full fee pursuant to the Fee and Schedule section above. If, however, Developer moves forward with a HTC investor that is not one of the Protected Investors, Consultant shall earn one-half (1/2) of the fee that it would have otherwise earned under the Fee and Schedule section above.

ECF No. 45-5.

It is clear from this email exchange and the contract language that the parties intended to give 10 South Street the unilateral right to terminate under certain circumstances while, at the same time, protect Wishneff from being cut out of the deal. What is unclear, however, is what happens if a portion of Wishneff's fee is paid—or earned, but not paid—before 10 South Street exercises its option to terminate. The fee payment schedule provides

24

for payment of Wishneff's fee at various points of Project completion. The problem with 10 South Street's argument is that it reads this fee payment schedule out of the Agreement.

As previously explained, there is a question of fact as to whether "gross equity payment" means the HTC investor's aggregate capital contributions, or whether payment means funds actually delivered.[10] Viewing the facts in light most favorable to Wishneff, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), the court will assume for purposes of this analysis that Wishneff's reading of the contract is correct and he is entitled to a fee of $1,000,000 based on PNC's projected capital contributions of $37,201,038. Wishneff argues it earned $200,000 as of the date of the initial equity closing, and that 10 South Street's Stephen Benjamin orally admitted as much. Wishneff Rule 30(b)(6) Dep., ECF No. 63-8, at 70-71. 10 South Street contends that any and all of Wishneff's fee was nullified by the subsequent termination of the contract. This argument begs the following question: If 10 South Street had, in fact, paid Wishneff $200,000 at closing,[11] would Wishneff be required to pay that $200,000 back if 10 South Street later terminated prior to the Project completion and occupancy of the building? The position taken by 10 South Street suggests it would. The court is not so certain.

The conundrum here is that the agreement memorializing the HTC investor's investment in the Project provides for payment of PNC's capital contributions in installments, following the satisfaction of certain criteria. See ECF No. 63-6, at Ex. G.

---

[10] Gross equity payment is defined neither in the parties' Agreement, nor in the July 1, 2012 Amended and Restated Operating Agreement of 10 SSA Master Tenant, LLC, documenting PNC's intended investment in the Project. See ECF No. 63-6.

[11] It matters not for purposes of this hypothetical whether the "closing" is an initial equity closing (which is what appears to have taken place here) or a closing on the entirety of PNC Bank's capital contribution to this Project. The court notes, however, that there is an unresolved issue as to what "closing" means in the Fees and Schedule section of the Agreement. See 10 South Street Rule 30(b)(6) Dep., ECF No. 63-7, at 20-23.

Those installments do not neatly correspond with the fee payment schedule set forth in the Agreement between 10 South Street and Wishneff, which is tied to phases of Project development. The court is therefore left with a number of questions about the parties' intentions regarding the termination provision. Those questions include whether the parties intended that Wishneff would be paid any portion of its fee earned prior to termination, and, if so, the amount of that fee and whether, in fact, any fee was earned under the contract terms as of the date of termination. These lingering issues lead the court to conclude that summary judgment is not appropriate at this time.

### D.

In sum, a bench trial must be conducted to resolve the factual disputes in this case. In addition to the factual and legal issues as to the meaning of "gross equity payment" and the operation of the termination provision discussed supra, other factual issues need to be addressed at the bench trial of this case, including: (1) Did a "closing" occur on July 1, 2012 (or otherwise) within the meaning of the Fees and Schedule paragraph of the Agreement? (2) If so, were "sufficient funds" "available from a credit investor and/or bridge loan lender," triggering a payment of 20% of Wishneff's fee? (3) Was the 20% payment due at closing contingent upon 10 South Street's ability to keep the $200,000 contributed by PNC? In other words, does the June 25, 2015 repurchase of PNC's interest as an investor member in 10 SSA Master Tenant, LLC render moot 10 South Street's obligation to pay Wishneff 20% of its fee at closing? (4) When were the Economic Projections, set forth as Exhibit 6 to Wishneff's Rule 30(b)(6) deposition, ECF No. 66-5, finalized and what, if any, legal significance do they have?

26

The parties are **DIRECTED** to advise the court within seven (7) days as to whether additional discovery is necessary or whether the case may be tried before the court as scheduled on December 19 and 20, 2016.

An appropriate Order will be entered.

Entered: *11-11-2016*

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge