CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 11 2017

JULIA C. DUDLEY, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| BRIAN WISHNEFF & ASSOCIATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 7:15-cv-00411 |
| v. | ) |
| | ) |
| 10 SOUTH STREET ASSOCIATES, LLC, | ) By: Michael F. Urbanski |
| | ) Chief United States District Judge |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

Plaintiff Brian Wishneff & Associates brought this breach of contract action against 10 South Street Associates, LLC, alleging it is due a fee for services under the parties' 2009 Battery Maritime Building Historic Tax Credit Agreement. Finding issues of fact as to the amount of any fee due plaintiff under the Agreement and the payment schedule for such fee, the court denied defendant's motion for summary judgment and the case proceeded to trial. The court empanelled an advisory jury for the bench trial held on April 3-4, 2017. The jury returned a verdict in plaintiff's favor in the amount of $2,800.00. The court will adopt that verdict and, based on the findings of fact and conclusions of law that follow, will enter judgment for plaintiff in the amount of $2,800.00.

### FINDINGS OF FACT

1. Plaintiff Brian Wishneff & Associates is a limited liability company that provides

historic tax credit consulting services to real estate developers in order to help fund building renovation projects. Brian Wishneff is president and half-owner of the company. His son, Erik Wishneff, is in-house counsel.

2. After reading in a newspaper article in 2008 about the potential renovation of the Battery Maritime Building (the "Project"), located at the southern tip of Manhattan, Brian Wishneff contacted then-developer BMB Associates, LLC[1] about the opportunity to use federal historic tax credits to help fund the Project. On August 6, 2008, plaintiff and BMB Associates entered into a Battery Maritime Building Historic Tax Credit Agreement, pursuant to which Brian Wishneff & Associates would work to secure an historic tax credit investor and "earn a fee in an amount equal to 10% of the equity payment by the historic tax credit investor," to be paid "on the same schedule as the Developer receives payments and/or benefits from the Historic Tax Credit Investor." Pl.'s Ex. 1.[2] This was the standard form agreement used by Brian Wishneff & Associates at the time and did not provide for a cap on the fee plaintiff could earn. Under the terms of this agreement, plaintiff would be paid a percentage of whatever the historic tax credit (HTC) investor paid into the project on the same schedule as the HTC investor made its payments to the developer. Brian Wishneff & Associates secured one or more term sheets from perspective HTC investors pursuant to this contract; however, the deal ultimately did not go through and BMB Associates did not proceed with development of the Project.

3. Defendant 10 South Street Associates, LLC [3] was later designated by the City of

---

[1] At the time, BMB Associates had been designated by the City of New York for the potential renovation of the former Battery Maritime Building. BMB Associates is affiliated with the Dermot Company, Inc. See Pl.'s Ex. 1.
[2] References made herein are to trial exhibits unless otherwise noted.
[3] 10 South Street is also affiliated with the Dermot Company, Inc. See Pl.'s Ex. 10.

2

New York for the redevelopment Project. Plaintiff and 10 South Street negotiated terms of a new Battery Maritime Building Historic Tax Credit Agreement (the "Agreement"), which was executed on October 26, 2009. Pl.'s Ex. 10. This Agreement, which is the subject of the instant lawsuit, reduces and caps the fee plaintiff could earn under the Agreement in exchange for a specific fee payment schedule tied to the phases of Project development. The Agreement provides that plaintiff "would earn a fee in an amount equal to 7% of the gross equity payment by the historic tax credit Investor," not to exceed $1,000,000. The fee payment schedule reads as follows: "If sufficient funds are available from a credit investor and/or a bridge loan lender, the Consultant shall be paid 20% of its fee at closing, 20% half-way through to closing, 45% at certificate of occupancy or occupancy and 5% upon any final equity payment by the Investor."

The Agreement also contains the following termination provision:

> If the Consultant [Brian Wishneff & Associates] has not produced a term-sheet from a historic tax credit investor within 90 days, then after 90 days the Developer [10 South Street] may terminate this Agreement at any time for convenience. If at any point in the future the Developer withdraws from the project the Developer can terminate for convenience. In addition, at any time after the eighteen (18) month anniversary of execution of this Agreement, the Developer may terminate this Agreement for convenience. Upon such a termination, Consultant shall deliver a list of all potential investors ("Potential Investors") that it has contacted related to the HTCs being generated by the Project. If any [sic] anytime in the future, Developer proceeds with the Project and one of the Protected Investors becomes an investor in any [historic tax credits] generated by the Project, Consultant shall earn its full fee pursuant to the Fee and Schedule section above. If, however, Developer moves forward with a HTC investor that is not one of the Protected Investors, Consultant shall earn one-half (1/2) of the fee that it would have otherwise earned under the Fee and Schedule section above.

3

4. Plaintiff secured term sheets for the Project from three potential HTC investors, one of which was PNC Investment Company, LLC. PNC's projected capital contributions exceeded $37,000,000.

5. On July 1, 2012, a 10 SSA Master Tenant, LLC Amended and Restated Operating Agreement was executed, pursuant to which PNC was admitted as an investor member of the company. Def.'s Ex. 1. Under the terms of this Amended and Restated Operating Agreement, PNC was obligated to make a capital contribution to the company for purposes of developing the Project; in return, it expected to receive certain tax benefits. See id. at Art. V. PNC's capital contribution was payable in three installments. The first installment of $200,000 was to be paid on the date the Amended and Restated Operating Agreement was executed. The second projected payment of $32,575,534 and third projected payment of $5,783,918 were payable after certain other conditions were met. Def.'s Ex. 1, at Ex. G. PNC paid its first installment payment of $200,000 on July 1, 2012.

6. The following day, Brian Wishneff emailed Stephen Benjamin of 10 South Street, congratulating him on the HTC closing and inquiring as to whether 10 South Street was in a position to pay plaintiff's invoice with the construction loan in place. Benjamin took the position that "[t]he money is not payable until we have received the funds [from PNC]. Several years from now." Pl.'s Ex. 11. In an email dated July 31, 2012, Brian Wishneff sent wiring instructions along with an invoice for $200,000, noting "[a]ccording to our agreement

we are to be paid $200,000 of our fee at Closing or June 2012."[4] Pl.'s Ex. 12. Drew Spitler of the Dermot Company responded: "The agreement is clear that the schedule of payments is conditioned on sufficient funds being available. . . . We will be in touch with you when the funds from pnc are expected to be sent to us." Id. By letter dated January 2, 2013, counsel for 10 South Street informed plaintiff that it was not entitled to the invoiced amount of $211,809.33[5] at that time, as, under the Agreement, plaintiff "may be entitled to payment when and if the Developer receives payment from PNC." Pl.'s Ex. 15. By letter dated April 20, 2015, 10 South Street continued to take the position that sufficient funds were not available to trigger payment of plaintiff's fee under the terms of the parties' Agreement:[6] "There are not sufficient funds at this time. Furthermore, there may never be sufficient funds as the project is over-budget and may not be completed at all. Since funds are only due to you *"[i]f sufficient funds are available"*, no funds are due at this time. You also claim interest is due, but none is due since there have never been sufficient funds available." Pl.'s Ex. 16.

7. 10 South Street commenced construction on the Project.

8. Two subsequent events impeded the development progress. The first was a ruling handed down on August 27, 2012 in the case of Historic Boardwalk Hall, LLC v. Commissioner of Internal Revenue, 694 F.3d 425 (3d Cir. 2012), cert. denied, 133 S. Ct. 2734 (2013), which affected PNC's qualification as an HTC investor on the Project given the way its investment had been structured. See Aff. of Stephen Benjamin, ECF No. 45-2, at ¶

---

[4] Plaintiff took the position that it earned a fee of 7% of PNC's projected equity contribution of more than $37,000,000, which fee was capped at $1,000,000, and that 20% of that $1,000,000 fee, or $200,000, was due and owing as of the closing on July 1, 2012.
[5] The referenced invoice was dated December 10, 2012. Pl.'s Ex. 15.
[6] The invoice referenced in this letter was dated March 26, 2015 in the amount of $262,697.00. Pl.'s Ex. 16.

5

23. The second event was Hurricane Sandy, which hit the New York area in late October 2012 and flooded lower Manhattan, bringing construction on the Project to a complete halt for nearly a year.

9. The Project ultimately became economically unfeasible, and 10 South Street discontinued development. On June 25, 2015, 10 South Street returned PNC's $200,000 payment and paid PNC an additional $183,117.05 in legal fees, costs and expenses, pursuant to the repurchase obligation set forth in the Amended and Restated Operating Agreement dated July 1, 2012. Def.'s Ex. 13; see also Def.'s Ex. 1 at § 5.05; Aff. of Stephen Benjamin, ECF No. 45-2, at ¶ 24.

10. On July 27, 2015, 10 South Street issued a Notice to Terminate Agreement to Brian Wishneff & Associates. Def.'s Ex. 14. The Notice stated that pursuant to page 6 of the parties' 2009 Agreement, 10 South Street had determined to withdraw from the Project "for convenience." Id.

11. 10 South Street did not pay Brian Wishneff & Associates any fee under the parties' Agreement.

12. The court finds after exhaustive review of the evidence that 10 South Street breached its contract with Brian Wishneff & Associates by failing to pay the portion of plaintiff's fee earned as of the date the contract was terminated. The parties entered into a valid contract, which provided that plaintiff would earn "a fee equal to 7% of the gross equity payment by the historic tax credit Investor." The HTC investor, PNC, made one equity payment of $200,000 into the Project. The parties further agreed that 10 South Street would pay plaintiff its earned fee pursuant to a certain payment schedule tied to phases of

Project development. Specifically, the Agreement provided that "[i]f sufficient funds are available from a credit investor and/or a bridge loan lender, [plaintiff] shall be paid 20% of its fee at closing. . . ." Pl.'s Ex. 10. A closing occurred on July 1, 2012 within the meaning of the Fees and Schedule provision of the contract. The court finds that sufficient funds were available from the HTC investor such that 10 South Street was obligated to pay Brian Wishneff & Associates $2,800, which is 20% of its contractually agreed-upon fee (7% of PNC's $200,000 equity payment =$14,000), as of the July 1, 2012 closing.

10 South Street later ceased development of the Project, eventually invoking the termination provision of the parties' Agreement, which allowed 10 South Street to terminate for convenience. Plaintiff's fee of $2,800 had been earned and was due and owing under the terms of the contract prior to the date 10 South Street exercised this termination option. Accordingly, the court finds 10 South Street liable to Brian Wishneff & Associates for breach of contract in the amount of $2,800.00.

## CONCLUSIONS OF LAW

The parties to this case entered into a written contract on October 26, 2009, pursuant to which plaintiff Brian Wishneff & Associates would earn a fee in exchange for managing the tax credit process to assist in funding development of the Battery Maritime Building Project. By notice given July 27, 2015, defendant 10 South Street terminated that contract without payment of any fee to plaintiff. Plaintiff filed the instant lawsuit alleging breach of contract on July 29, 2015. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

The contract at issue contains a clear choice-of-law provision. Thus, New York law governs. Frankel v. Citicorp Ins. Servs., Inc., 80 A.D.3d 280, 285, 913 N.Y.S.2d 254, 259 (2010) ("New York courts will generally enforce a clear and unambiguous choice-of-law clause contained in an agreement so as to give effect to the parties' intent"); Welsbach Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y.3d 624, 629, 859 N.E.2d 498, 500 (2006) ("Generally, courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction.").

The elements required under New York law to prove a claim of breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and the damages resulting from the breach. See Dee v. Rakower, 112 A.D.3d 204, 209, 976 N.Y.S.2d 470, 474 (2013); Harris v. Seward Park Hous. Corp., 79 A.D.3d 425, 426, 913 N.Y.S.2d 161, 162 (2010). As the court previously determined, the language in the Fees and Schedule provision of the contract is ambiguous, and the court must consider extrinsic evidence in order to discern whether the parties intended that plaintiff would be owed a fee for services rendered prior to defendant's termination of the contract. Nappy v. Nappy, 40 A.D.3d 825, 826, 836 N.Y.S.2d 256, 257 (2007); Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569-70, 780 N.E.2d 166, 170 (2002). After consideration of the evidence adduced at trial, the court finds that plaintiff Brian Wishneff & Associates has met its burden of proving the elements of breach of contract by a preponderance of the evidence.

Specifically, the court finds the existence of a valid, enforceable, written contract.[7] Plaintiff has proved it performed under the terms of that contract by securing term sheets from three potential HTC investors and by securing investment by one of those investors, PNC, as set forth in the 10 SSA Master Tenant, LLC Amended and Restated Operating Agreement executed on July 1, 2012.

In their 2009 Agreement, the parties agreed that plaintiff would earn "a fee equal to 7% of the gross equity payment by the historic tax credit Investor," and 10 South Street would be obligated to pay plaintiff 20% of that fee at closing "[i]f sufficient funds are available from a credit investor and/or a bridge loan lender." The evidence establishes that a closing occurred within the meaning of the Fees and Schedule provision of the contract on July 1, 2012, upon the execution of the 10 SSA Master Tenant, LLC Amended and Restated Operating Agreement, pursuant to which PNC made an equity payment of $200,000. The court finds that sufficient funds were available from the HTC investor as of July 1, 2012, such that $2,800 of plaintiff's fee was due and owing as of that date. In so finding, the court credits the testimony of Brian Wishneff that in entering into this contract, plaintiff agreed to take a reduced fee of 7%, capped at $1,000,000, in exchange for a fee payment schedule tied to the phases of Project development, rather than its typical fee arrangement of 10%, with no cap, to be paid on the same schedule as the developer received payments from the HTC investor.

---

[7] The court previously ruled that the contract's unilateral termination provision did not render this contract illusory, invalid and unenforceable. See Mem. Op., ECF No. 69. There have been no other challenges raised to the existence of a valid contract in this case.

9

The court further finds based on the evidence that the parties intended by agreeing to this particular fee payment schedule that 10 South Street would be obligated to pay Brian Wishneff & Associates the portion of its fee earned under the terms of the Agreement even though the Project was eventually cancelled, 10 South Street repurchased PNC's equity investment into the Project, and there were no tax credits. Additionally, the court finds that the parties intended that $2,800 was to be paid to Brian Wishneff & Associates as of the closing on July 1, 2012, pursuant to the contractually agreed-upon fee payment schedule, despite the fact that 10 South Street exercised its option to terminate the contract for convenience three years later.

In sum, the court finds that plaintiff has met its burden of establishing the elements of breach of contract by a preponderance of the evidence and, accordingly, finds in favor of Brian Wishneff & Associates. The court therefore will **GRANT** judgment to the plaintiff in the amount of $2,800.00.

An appropriate Order will be entered.

Entered: July 10, 2017

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge